**Dorethea N. HORNBUCKLE,**
**Plaintiff-Appellant,**

v.

**ARCO OIL AND GAS COMPANY,**
**Defendant-Appellee.**

**No. 84–5028**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Sept. 16, 1985.

---

**1322**

Frank P. Hernandez, Dallas, Tex., for plaintiff-appellant.

Thompson & Knight, Bennett W. Cervin, Arlene F. Switzer, Dallas, Tex., for defendant-appellee.

Before RUBIN, JOHNSON and JONES, Circuit Judges.

PER CURIAM:

Dorethea Hornbuckle appeals for the second time from the district court's dismissal of her Title VII suit as a sanction for failure to prosecute. On her first appeal, a panel of this Court reversed the district court's judgment and remanded the case to the trial court "for express findings concerning whether Hornbuckle had the ability to pay the sum assessed as an alternative to dismissal, and, if not, whether any sanction less severe than dismissal ... would be appropriate and sufficient." *Hornbuckle v. ARCO Oil & Gas Co.*, 732 F.2d 1233, 1237 (5th Cir.1984).

In accordance with this Court's instructions, upon remand the district court made detailed findings of fact and again dismissed Hornbuckle's suit. We conclude that the district court's judgment is based on findings of fact which are not clearly erroneous and that no error of law appears. Accordingly, for the reasons set forth in the district court's judgment, which we attach as an appendix to this opinion, we affirm.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| DORETHEA N. HORNBUCKLE | * |
| | * |
| Plaintiff | * |
| | * Civil Action No. 3–81–1663–H |
| v. | * |
| | * |
| ARCO OIL & GAS COMPANY | * |
| | * |
| Defendant | * |

### COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is before the Court on remand from the Court of Appeals for certain express findings regarding the basis for dismissal of this suit.

#### Background

This case was called for trial on April 27, 1983, after having been continued twice at Plaintiff's request. Without prior notice to the Court, Plaintiff's counsel, Mr. Frank Hernandez, refused to proceed. The Court found that the reasons given for the refusal were not valid or made in good faith, and that Mr. Hernandez's conduct throughout the course of the litigation had been unacceptably dilatory. Plaintiff's refusal was disruptive of the Court's docket and inconvenient to the other litigants who were ready for trial. *See* Order, dated April 29, 1984.

Plaintiff was ordered to reimburse the Defendant those fees and expenses incurred in preparation for the scheduled trial. When Plaintiff failed to do so, the Court dismissed the suit. *See* Order, dated May 27, 1983. On appeal, the Court's power to impose sanctions was affirmed, but the case was remanded "for express findings concerning whether Hornbuckle had the ability to pay the sum assessed as an alternative to dismissal, and, if not, whether any sanction less severe than dismissal, including those that might be assessed against counsel, would be appropriate and sufficient." *Hornbuckle v. Arco Oil & Gas Co.*, 732 F.2d 1233, 1237 (5th Cir.1984). In order to make the necessary findings, this Court established a schedule for discovery limited to information regarding Plaintiff's ability to pay the sanctions imposed by the Court. *See* Orders dated July 30, 1984, and October 1, 1984.

In addition to the record from the original proceedings, the following documents are before the Court:

1. Defendant's Interrogatories and Request for Production of Documents and Things on the Issue of Ability to Pay Monetary Sanction;

2. Defendant's Request for Admissions on the Issue of Ability to Pay Monetary Sanction;

3. Defendant's Second Request for Production of Documents and Things on the Issue of Ability to Pay Monetary Sanction;

4. Plaintiff's Answers to Defendant's Interrogatories and Request for Production of Documents and Things on the Issue of Ability to Pay Monetary Sanction, with Attachments;

5. Plaintiff's Response to Defendant's Second Request for Production of Documents and Things on the Issue of Ability to Pay Monetary Sanction;

6. Plaintiff's Response to Defendant's Request for Admissions;

7. Original Deposition and two handwritten pages of corrections of Dorethea N. Hornbuckle, dated September 19, 1984;

8. Original Deposition of Jesse James Hornbuckle, Jr., dated September 19, 1984;

9. Original Deposition of Patrick G. Calhoun, dated October 8, 1984.

Pursuant to the instructions of the Court of Appeals and upon consideration of the evidence, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. At the time of the filing of this lawsuit in September 1981, Plaintiff was employed as a professional in Defendant's Employee Relations Department in salary grade 4412, earning $1315.56 bi-weekly. (D. Hornbuckle Dep. (Original Proceeding), Vol. I, at 27, 117). In calendar year 1982, she received gross wages in excess of $36,000 (Blaylock Affidavit, Ex. 2).

2. When the Court assessed the monetary sanction on May 19, 1983, Plaintiff was earning $1,506.06 bi-weekly. Her gross wages for calendar year 1983 were approximately $39,300 (Blaylock Affidavit, Ex. 3). As of April 12, 1984, Plaintiff was compensated at a gross bi-weekly wage rate of $1,565.30 (Blaylock Affidavit, Ex. 4).

3. Plaintiff maintained an account with the Atlantic Richfield Thrift Plan (the "Thrift Plan"), a tax-qualified profit-sharing plan. Pursuant to the plan's terms, Defendant contributed to Plaintiff's account an amount equal to the contributions which she authorized, up to a maximum of four percent of her wages. (Bengtson Affidavit, ¶ 4). Hornbuckle contributed $1,124.53 to the Thrift Plan in calendar year 1982. (Blaylock Affidavit, Ex. 5, 6).

4. Plaintiff terminated her membership in the Thrift Plan effective July 23, 1982. At that time, she received U.S. Savings Bonds, the cost basis of which was $2,200. She also received a cash payment of $6,523.01. (Bengtson Affidavit, ¶¶ 13, 14, 15).

5. On January 1, 1983, Defendant established the Atlantic Richfield Savings Plan

(the "Savings Plan"), which was similar in purpose to the prior Thrift Plan. When Plaintiff enrolled in the Savings Plan on January 1, 1984, she agreed to contribute two percent of her wages into her member account and, in accordance with the terms of the Savings Plan, Defendant contributes four percent of her wages into her company account. (Bengtson Affidavit, ¶ 16). As of July 19, 1984, Hornbuckle had contributed $464.05 into her member account. (Blaylock Affidavit, Ex. 8).

6. Plaintiff enrolled in the Atlantic Richfield Capital Accumulation Plan (the "CAP") when it was initiated by Defendant on January 1, 1983. (Bengtson Affidavit, ¶¶ 5, 18). The CAP is a voluntary deferred compensation plan which provides employees the opportunity to accumulate a specified percentage of their gross pay and to defer payment of federal income tax for such accumulated earnings. Defendant automatically contributes one percent of each employee's gross earnings into the employee's CAP company account. At the time of her enrollment, Plaintiff agreed to defer receipt of six percent of her wages to be deposited into her CAP member account. (Bengtson Affidavit, ¶¶ 5, 18). In 1983, Plaintiff authorized $3,930.64 to be deposited into her CAP member account. (Blaylock Affidavit, Ex. 7). Thereafter, through July 19, 1984, Plaintiff deferred receipt of an additional $1,392.14 to be deposited into her CAP member account. (Blaylock Affidavit, Ex. 8).

7. Plaintiff participated in the Atlantic Richfield Employee Stock Ownership Plan (the "ESOP") by authorizing deductions from her salary as payment for the purchase of shares of ARCO common stock. The terms of the ESOP require ARCO to contribute automatically a specified percentage of each employee's wages into an ESOP account, and to contribute an amount equal to all contributions authorized by each employee. (Bengtson Affidavit, ¶ 6). Plaintiff contributed into her ESOP account $188.00 in 1982; $326.00 in 1983; and $416.10 in 1984 through July 19. (Blaylock Affidavit, Ex. 5–8).

8. Plaintiff also authorized other voluntary deductions from her gross earnings. A substantial percentage of all of her voluntary deductions each year has been for tax deferment or deferred compensation benefit plans, as shown below for the specified time periods:

| Year | Total Voluntary Deductions | Total Deductions for Savings, Thrift, CAP, and ESOP |
|---|---|---|
| 1982 | $5,294.47 | $1,312.53 |
| 1983 | $9,627.84 | $4,256.64 |
| 1/1/84–7/19/84 | $5,730.63 | $2,272.29 |

(Blaylock Affidavit, Exs. 5–8).

9. Plaintiff's participation in the thrift, savings, capital accumulation, and stock ownership plans, and her management of the substantial attendant discretionary contributions, evidence both a degree of financial sophistication and an ability to direct her resources.

10. Plaintiff's husband has been employed by Trailways, Inc. for the past 17 years. (J. Hornbuckle Dep. at 13). In 1980, he accepted a position as a manager of Trailways' Accounts Receivable Department at an annual salary of $25,000. (J. Hornbuckle Dep. at 14, 16). In October 1983, he received a raise which increased his gross wages for calendar year 1983 to over $26,700. (J. Hornbuckle Dep. at 17, Ex. 2).

11. Dorethea and Jesse Hornbuckle's gross earnings totalled $61,041.24 in 1982, and $66,015.94 in 1983). (Blaylock Affidavit Exs. 1–3; J. Hornbuckle Dep. at 16–17, Ex. 2). The Court finds that such amounts are not insubstantial, and that Plaintiff was and is not impecunious.

12. The Hornbuckles own a private residence located at 1824 Kirnwood Drive, Dallas, Texas. The home consists of three bedrooms, a den, living room, a kitchen, two bathrooms, and a two-car garage. The outstanding loan balance on the home, at the close of 1983, was approximately $20,800. Their monthly mortgage payment is $278.00. (Plaintiff's Answers to Defendant's Interrogatories and Request for Pro-

duction of Documents and Things, Nos. 9, 31, 36 and attached documents).

13. The Hornbuckles at material times have owned two automobiles: a 1979 Chevrolet Monte Carlo and a 1976 Plymouth Volare. Other personal assets of significant value include a fur jacket, purchased sometime in 1980 or 1981, which Plaintiff values at $1,800. (Plaintiff's Answers to Defendant's Interrogatories and Request for Production of Documents and Things, No. 14; D. Hornbuckle Dep. at 22–23).

14. The Hornbuckles own approximately $500 worth of stock of the Sunbelt National Bank, and 25 shares of common stock of ARCO. (Plaintiff's Answers to Defendant's Interrogatories and Request for Production of Documents and Things, No. 15). As of May 4, 1983, the shares of ARCO were worth approximately $1,144. (Bengtson Affidavit, ¶ 19).

15. The Hornbuckles had several checking and credit union accounts which exhibited substantial deposit and withdrawal activity. The daily balances in these accounts often fluctuated significantly. However, at the time of the Court's Order assessing the monetary sanction, the Hornbuckles had at least $2,465 in cash or assets which could be readily converted to cash. In addition to the $1,644 worth of stock already noted, Plaintiff had approximately $203 in her Atlantic Federal Credit Union savings account as of May 27, 1983; and the balance in Plaintiff's checking account at RepublicBank Dallas as of May 23, 1983, was $619. Furthermore, as of September 30, 1983, Jesse Hornbuckle had a cumulative share balance of $1,627 in his Trailways Credit Union sub-accounts. (Plaintiff's Answers to Defendant's Interrogatories and Request for Production of Documents and Things, and attached documents).

16. Under the terms of the Atlantic Richfield Capital Accumulation Plan, a participant may withdraw funds from his or her account upon a showing of financial hardship. (Bengtson Affidavit, ¶ 5). As of May 4, 1983, Plaintiff had 15.682 shares of ARCO common stock in her Atlantic Rich-field CAP member account, and 2.492 shares in her CAP company account. The aggregate value of these shares was $831.46. (Bengtson Affidavit, ¶ 19).

17. Plaintiff's efforts to obtain a sufficient sum of money to satisfy the sanction imposed in May 1983 were: (a) a review of bank and other savings records to determine the amount of cash assets, and (b) a telephone inquiry to the Credit Union to determine the possibility of a loan. (D. Hornbuckle Dep. at 41). Plaintiff made no effort to withdraw funds from her CAP account (D. Hornbuckle Dep. at 21); to enlist her husband's aid in raising the needed amount because of his blemished credit status (D. Hornbuckle Dep. at 41, 54–57; J. Hornbuckle Dep. at 24–26); to borrow from friends or relatives (D. Hornbuckle Dep. at 41); or to sell any personal property (D. Hornbuckle Dep. at 41).

18. Plaintiff is a member of the Atlantic Federal Credit Union (the "Credit Union"), a federally chartered financial institution (Calhoun Dep. at 9). Before the entry of the Court's Order assessing the sanction, Plaintiff had obtained unsecured loans from the Credit Union. In July 1982, she obtained an unsecured loan for $1,000, and her line of credit was adjusted to the same amount. In January 1983, she borrowed $3,500, and her line of credit was increased to $5,000 to cover her then current outstanding loan balances of $4,336.85. (Calhoun Dep., Exs. 6, 7).

19. Plaintiff states that, in accordance with her usual practice when seeking a Credit Union loan, she telephoned the Credit Union to inquire about borrowing the $5,700 sanction amount. She was told that she did not have a line of credit to cover borrowing an additional $5,700. (D. Hornbuckle Dep. at 33–34, 37–38). Although Patrick Calhoun, the Credit Union vice-president, testified that Credit Union employees are instructed to refrain from commenting in telephone conversations with respect to a member's entitlement to credit, and that employees simply advise members seeking an extension of credit to complete an application form (Calhoun Dep. at 49–

50), the information claimed to have been received by Plaintiff was consistent with the $5,000 credit limit which had been established in January 1983. She did not pursue the loan through personal conference with a Credit Union officer or by making the written application required for any loan. (D. Hornbuckle Dep. at 34). Credit Union records reflect neither an inquiry nor an application with respect to the $5,700 amount. (Calhoun Dep. at 35–36).

20. Pursuant to the policies of the Credit Union, a member may obtain an unsecured signature loan which varies in amount based upon length of membership and the member's salary. (Calhoun Dep. at 19–20, Ex. 3). Based upon Plaintiff's length of membership in the Credit Union and her salary in May 1983, Plaintiff would have been entitled at the time of the sanction Order to borrow $9,789.39, less any outstanding loan balances. (Calhoun Dep. at 34).

21. Thus, while her available credit limit was stated to be $5,000 prior to November 1983, Plaintiff had actually been eligible for a credit limit in excess of $9,000 since 1982. To obtain this higher credit limit, she would have had to file a new master credit application. She did complete such an application in November 1983, and her credit limit was raised to $9,900. (Calhoun Dep. at 29–31).

22. In May 1983, Plaintiff had an outstanding loan balance of $3,734.12. Deducting this amount from Plaintiff's available line of credit, Calhoun concluded and the Court finds that Plaintiff would have been eligible to borrow up to $6,055.27 in May 1983. (Calhoun Dep. 35). The Credit Union had funds available to be lent at that time. (Calhoun Dep. at 32). By August 17, 1984, Plaintiff had loans totalling $13,-180.88 from the Credit Union. (D. Hornbuckle Dep. at 36).

23. In evaluating an applicant's entitlement to an unsecured signature loan, a Credit Union loan officer would consider the additional factor of the applicant's credit rating. (Calhoun Dep. at 20–21). With one exception, Plaintiff's credit reports were consistently favorable. (Calhoun Dep. at 39–42, Ex. 6–B, 6–C). The one exception concerned a report from a Dallas area credit bureau indicating that Plaintiff had failed to pay an outstanding bill for $86.00 to a physician. On the basis of that adverse report, Plaintiff's July 8, 1982, request for a loan for $1,000 from the Credit Union was initially rejected. On July 12, 1982, Plaintiff paid the physician's statement. She then renewed her loan request, and the $1,000 amount she sought was approved and funded on July 14, 1982. (Calhoun Dep. at 36–38, Ex. 6, 6–A, 6–B).

24. The adverse credit entry last appeared on a report obtained by the Credit Union on January 19, 1983, at the time Plaintiff borrowed an additional $3,500. The copy of the report in the Credit Union's files was annotated to indicate that the problem item had been taken care of. All subsequent reports in Plaintiff's account file indicated that she had an excellent credit rating. (Calhoun Dep. at 39–46, Exs. 6–B, 6–C, 8, 9). Credit reports obtained by Neal Bondy, AOGC's Employee Relations Manager, from two separate credit reporting services also showed that Plaintiff had an unblemished credit record. (Bondy Affidavit, ¶¶ 3, 4, 5). While there is no credit report in Plaintiff's Credit Union account file obtained in May 1983, Calhoun explained that numerous reports might have been obtained, but only those with adverse information are retained for a long-term period as specified by law. (Calhoun Dep. at 68–70). It is therefore properly inferred that in May 1983, Plaintiff had a good credit rating, as commercially reported in the ordinary course of business.

25. According to the reports obtained by Bondy, Plaintiff opened credit accounts with the following companies between September 1982 and April 1984; Saks Fifth Avenue, Bloomingdale's, American Airlines, Mervyn's, Marshall Fields, Corrigan's, Neiman-Marcus, Republic National Bank MasterCard, and General Electric Credit Center. (Bondy Affidavit, ¶ 6). In addition to the foregoing, the Hornbuckles had active charge accounts in 1983 at Mont-

gomery Ward, Lester Melnick, Bag 'n Baggage, Macy's, Jas. K. Wilson, Gimbels, Preferred Shoppe, American Express, and Bergdorf Goodman. (Plaintiff's Answers to Defendant's Interrogatories and Request for Production of Documents and Things, No. 38).

26. Plaintiff has otherwise accessed various credit sources. In September 1982, she made a bank credit transaction with Republic National Bank in the amount of $2,236 (including principal and interest). (Bondy Affidavit, ¶ 7). In March 1984, she received a loan from Republic National Bank Oak Cliff for the amount of $1,553 (including principal and interest), and from Republic National Bank in July 1984, for $2,987 (including principal and interest). (Bondy Affidavit, ¶ 7).

27. Just two days before Plaintiff was required to pay the monetary sanction in order to preserve her Title VII claim against Defendant, she made written application for a Credit Union loan of $300. The Credit Union approved and funded her application on May 25, 1983. (Calhoun Dep., Ex. 6–D, 7–A). Calhoun noted that it was unnecessary to increase Plaintiff's credit limit at the time, because her total loans still did not exceed her stated $5,000 limit. (Calhoun Dep. at 92).

28. Thereafter, Plaintiff's Credit Union borrowing activity increased substantially. On August 4, 1983, she requested and obtained a loan for $600. (Calhoun Dep. Ex. 6, 7). Another request by Plaintiff for a loan was granted on November 16, 1983, in the amount of $1,209.31. (Calhoun Dep. Ex. 6, 7). On November 30, 1983, Plaintiff submitted an application for an unsecured loan of $1,500. The loan was duly approved, and because the total amount borrowed then exceeded the stated $5,000 credit limit, the limit was increased to $9,900. An additional loan request for $600, made on December 27, 1983, was also approved. (Calhoun Dep. Exs. 6, 6–E, 7).

29. Plaintiff continued to borrow against her Credit Union line of credit in 1984. On February 7, 1984, she requested and obtained an unsecured loan for $300.

(Calhoun Dep. Ex. 6, 7). At Plaintiff's request, this loan was increased on March 15, 1984, by the amount of $1,434.90. Plaintiff again borrowed from her line of credit in the amount of $1,661.24 on May 11, 1984. She borrowed another $501.08 on August 23, 1984. (Calhoun Dep., Ex. 6, 7).

30. The numerous unsecured loans which were extended to Plaintiff following the Court's imposition of the monetary sanction clearly establish that her credit rating would not have precluded her from obtaining a loan for $5,700 from the Credit Union in May 1983. (Calhoun Dep. at 45–46). Based upon the Credit Union's established repayment policies, Plaintiff would have paid a bi-weekly amount of $43.39, or its monthly equivalent, $94.01, to service a $5,700.00 loan. (Calhoun Dep. at 53–54).

31. The financial data and other documentation considered by the Court produces a meaningful pattern of Plaintiff's earnings, asset accrual and disposition, expenses, credit transactions, and borrowing ability, all of which directly bear on her ability to pay the sanction.

32. Upon the refusal of Plaintiff's counsel to proceed to trial in April 1983, Defendant sought dismissal of this suit pursuant to Fed.R.Civ.P. 41(b) for Plaintiff's failure to prosecute. As an alternative sanction to dismissal, however, the Court ordered Plaintiff to pay $5,701.43 upon consideration of the evidence before it and arguments of counsel. The suit was dismissed only after Plaintiff did not pay the assessed amount or otherwise respond to the Court's Order within the time period specified.

33. At the time of the Court's May 19, 1983 Order, Plaintiff had the ability to pay the sanction assessed against her.

34. A sanction was also assessed against Plaintiff's counsel. *See* Order dated April 29, 1983. The fines levied against Mr. Hernandez were reduced, however, and later withdrawn. Based upon the Court's familiarity with the pretrial proceedings and observation of Mr. Hernandez and his client when the matter came on for trial,

 the Court concluded that Plaintiff's sanction appropriately placed responsibility and remedied, at least in part, the injury caused to Defendant by the conduct of Plaintiff and her counsel.

35. Plaintiff specifically ratified and endorsed the actions of her lawyer. (D. Hornbuckle Affidavit of Fact at 4, 5 filed May 27, 1983).

36. Plaintiff has made no offer of payment of the Court's sanction prior to dismissal.

*Conclusions of Law*

Based on the foregoing Findings of Fact, the Court concludes that the sanction previously imposed on Plaintiff was and is appropriate, and this action is **DISMISSED** with prejudice.

SO ORDERED.

DATED: November 13, 1984.

/s/ Barefoot Sanders
Barefoot Sanders
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DORETHEA N. HORNBUCKLE *

 Plaintiff

v. * Civil Action No. 3–81–1663–H

ARCO OIL & GAS COMPANY *

 Defendant

### ORDER

Reference is made to the Court's Findings of Fact and Conclusions of Law, filed November 13, 1984. The list of documents ending at the top of Page 3 is hereby supplemented to incorporate the following Items 10–12 which are cited throughout the Court's Findings, but were inadvertently omitted from the list:

10. Affidavit of Eleanor Blaylock, dated September 19, 1984;

11. Affidavit of Cynthia Bengston, dated September 20, 1984;

12. Affidavit of Neal D. Bondy, dated October 8, 1984.

**SO ORDERED.**

DATED: November 15, 1984.

/s/Barefoot Sanders
Barefoot Sanders
United States District Judge